## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA

JAMES ANDRIES AND ERIN ANDRIES,

      PLAINTIFFS,

vs.

THE COOPER COMPANIES, INC., A CORPORATION, AND COOPERSURGICAL, INC., A CORPORATION,

      DEFENDANTS.

CASE NO.:

---

## COMPLAINT AND JURY DEMAND

---

COME NOW the plaintiffs, James Andries and Erin Andries, by and through counsel of record, and, in support of their claims against CooperSurgical, Inc., a corporation, and The Cooper Companies, Inc., a corporation, state as follows:

## I.    ALLEGATIONS COMMON TO ALL COUNTS

### JURISDICTION

1.    This is a personal injury and property damage case based on negligence and breach of implied warranty for a particular purpose. Plaintiffs are husband and wife who were treated at the University of Iowa Hospitals and Clinics employing In Vitro Fertilization (IVF) to achieve pregnancy and the couple's first child. Plaintiffs suffered extensive economic and personal injury damages when defendants supplied defective and substandard IVF media culture which caused the loss of the mothers' eggs and embryos after a long and difficult IVF attempt which, unbeknownst to plaintiffs, was doomed from the start due to the defective and hence, toxic culture media.

2.      Plaintiffs James Andries (born 10/6/1988) and Erin Andries (born 6/9/1988) were married on October 26, 2019. At all times material hereto, they were citizens and residents of Lee County, Iowa.

3.      At all times material hereto, The Cooper Companies Inc. has been and continues to be a Delaware corporation, with its principal place of business in San Ramon, California, Contra Costa County.

4.      At all times material hereto, Defendant CooperSurgical, Inc. has been and continues to be a Delaware corporation, with its principal place of business in Trumbull, Connecticut. CooperSurgical, Inc. is also registered as a foreign corporation in Iowa, with a registered agent of Corporation Service Company, 505 5th Ave., Suite 729, Des Moines, Iowa 50309.

5.      Subject matter jurisdiction is predicated on 28 U.S.C. 1332 in that there is complete diversity of citizenship between the litigants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      At all times materials hereto, the Cooper Defendants were in the business of formulating, manufacturing, testing, advertising, shipping and selling a culture medium used in IVF for the preservation and storage of female eggs and the embryos created in the process of IVF, a medical process used to help couples with fertility issues have children.

7.      This Court has personal jurisdiction of the Cooper Defendants based on defendant's extensive commercial contacts with the State of Iowa, specifically, by advertising and selling its medical products to customers in the State of Iowa, and specifically, by formulating, selling and shipping its defective IVF culture medium to the fertility clinic at the University of Iowa Hospitals and Clinics (UIHC) in Iowa City, Johnson County, Iowa.

8.     At all times material hereto, the Cooper Defendants were experts in the field of human IVF treatment who had actual expert knowledge of the IVF process and the physical and emotional suffering which female IVF patients experience during any IVF treatment during the attempt to achieve a viable pregnancy.

9.     Mr. and Mrs. Andries met in 2016, and fell in love.  James had three children by a previous marriage but their marriage of October 2019 was Erin's first marriage and she had no children. By late 2022 and early 2023, Plaintiffs decided they wanted to have children of their own, but due to extraneous health issues, their options for starting a family were limited.

10.    With the advice of medical professionals, in September of 2023 Mr. & Mrs. Andries began the in vitro fertilization process, more commonly referred to as "IVF" at University of Iowa Hospitals and Clinics. (UIHC)

11.    IVF is a medical procedure that allows individuals and couples the opportunity to become pregnant using their own biological material. An IVF cycle typically involves the following steps: (1) the female patient takes medication to grow multiple eggs; (2) the clinic begins the "retrieval" process by surgically removing the eggs from the female's ovaries; (3) the eggs, in a laboratory setting, are inseminated with sperm, which are sometimes screened for viability as well; (4) the clinic sees which eggs are fertilized and fosters their development into embryos, including with the use of a culture (zygote eventually becomes a blastocyst); (5) an embryo is "transferred" into the female patient's uterus; and (6) the patient must begin taking additional hormones in order to thicken the uterine lining and ensure the pregnancy is successful.

12.    During the IVF process, the female patient must take a strict regimen of expensive injections of hormones and take other powerful medication as well. These injections have many known undesirable side effects, including the pain of the injection itself, bruising, redness,

swelling, bloating, weight gain, water retention, bone loss, fatigue, headaches, muscle aches, abdominal pain, tenderness, yeast infections, hot flashes, mood swings, depression, nausea, vomiting, diarrhea, blood clots, and strokes. It is common that, after the transfer, the patient must take painful injections from a large gauge needle once or twice a day for twelve weeks, meaning there are 84 to 168 injections just in this part of the process alone.

13.    The retrieval process itself is a surgical process where the patient is under anesthesia and the eggs are extracted via a large needle inserted through the vaginal wall. Multiple risks are involved with this, including infection, bleeding, and trauma to intra-abdominal organs, allergic reactions, low blood pressure, nausea, and vomiting. After the retrieval procedure, the patient will have residual pain and is on bedrest for one to several days.

14.    Mr. & Mrs. Andries were IVF patients of the University of Iowa Hospitals & Clinics ("UIHC") in Iowa City, Iowa. IVF requires a lengthy period of separate appointments where the Andries needed to travel one and half hours each way to attend them. These appointments include blood tests, invasive ultrasound examinations, etc.

15.    Once the retrieval is completed, the eggs will be placed into a culture and sperm will be placed with them in highly specific conditions, including controls for the culture they are placed in, temperature, humidity, light, and even odors can affect this process. If the eggs and sperm develop successfully, embryos grow and become viable over several days following insemination. Sometimes embryos do not become sufficiently viable in this process; however, if at least one is viable, the next step of the process begins.

16.    After retrieval, IVF patients generally receive a "fresh" embryo transfer and the remaining embryos, if any, will be frozen. A fresh transfer will occur after a few days of embryo development. Any embryos that are frozen will be cryogenically frozen and then, after a period

of time, the embryo is thawed and placed in the patient's uterus. So long as the remaining embryos are frozen properly, they can remain viable for years after the fact.

17.     IVF is expensive and generally not covered by most insurance providers. So, most couples who take IVF treatment must pay for it out of pocket.  The average cost for one cycle of IVF can cost $15,000 - $30,000, exclusive of plus expenses for transportation, lost income from missed work etc.

### The Andries' IVF Process

18.     The Andries began the IVF process in the Fall of 2023. They prepared for the expense, the many appointments, missed work, travel time, etc. They were hopeful as every completed appointment drew them closer to their goal of growing their family.

19.     Mrs. Andries began taking hormone shots on October 27, 2023. She was frightened by the sheer number of injections.  Her husband was supportive and helped with the injections at their home.

20.     Mrs. Andries was not ready for the emotional and physical toll the hormone shots would place on her body. Some shots were less painful than others but some caused intense stinging and burning. The resulting symptoms included abdominal discomfort, bruising, bloating, severe fatigue, and constipation. Mrs. Andries dreaded each injection because, just as she would start to feel better, it was time for the next dose.

21.     Many nights Mrs. Andries was unable to sleep for more than a few hours due to the severe aches, the swelling in her ovaries, etc. The process was difficult, but the Andries kept their eye on the end goal of growing their family.

22.     On November 7, 2023, Mrs. Andries went into retrieval. She was informed by UIHC physicians it was common for someone her age to have between 5 to 14 eggs. However,

the Andries had wonderful luck at this time and 35 eggs were retrieved, with 24 being mature. Due to the pain of the retrieval process, she stayed home for two days to recover.

23.     The Andries had a fresh transfer scheduled for November 12, 2023. The doctors explained that out of the 24 mature eggs, only 8 matured to a reasonable degree, which seemed unusual, as normally more would mature. Then, the physicians transferred two embryos, counting on one of them to mature to the blastocyte phase and implant to become a human pregnancy.

24.     The day after the transfer, Mrs. Andries received a message from UIHC that none of the remaining embryos qualified to be frozen and would be discarded. This information was heartbreaking. Now, in the Andries' situation, everything hinged upon the two embryos that had been transferred.

25.     Mrs. Andries began the hormone (progesterone) shots daily, another painful experience, but with the expectant hope of motherhood on the horizon.

26.     On November 20, 2023, Mrs. Andries took a pregnancy test, which was positive. The plaintiffs were ecstatic. Mrs. Andries was finally going to be a mother and she and James would have their first child.

27.     The Andries completed more trips for lab work and, just days before Christmas, on December 19, 2023, they went to their first ultrasound appointment, hoping to see their child for the first time. To the Andries' great shock, the ultrasound technician somberly informed them she was unable to find any viable fetus. The Andries, while heartbroken already over the loss of their remaining embryos, were devastated by this news.

28.     At this point, the Andries met with a UIHC physician, who informed them there was a problem with the culture media (the fluid the embryos are stored in). The culture media had not allowed the embryos to grow from their zygote phase into the blastocyte phase.

29.     The entire Andries IVF cycle had been a failure and wasted effort because the culture media provided by defendants which the eggs were stored in was defective and failed to support the extracted eggs.

**Defendants and the Global Culture Media**

30.     CooperSurgical, Inc. has a mission statement where they proudly tout that they are "a leading fertility and women's health company dedicated to putting time on the side of women, babies, and families at the healthcare moments that matter most in life."[1] Their website is filled with marketing and proud statements regarding their quality control, technology, and photos of families and children.

31.     One of CooperSurgical, Inc.'s products is its embryo culture media, called Global Media, which is a "[s]ingle-step medium for uninterrupted embryo culture," noting it is for embryo culture and transfer, and it is specifically designed with energy substrates and essential amino acids to support embryo growth and development.

32.     Defendant The Cooper Companies, Inc. operates through CooperSurgical, Inc., and touts themselves as a prominent leader in the global IVF market.

33.     One of the ingredients necessary for the culture media is magnesium and if there is not enough magnesium the culture media can cause embryo growth to arrest and inhibit DNA repair.

34.     In a letter dated December 5, 2023, CooperSurgical, Inc. issued an Urgent Recall notice for certain lots of its Global Media culture product. The Recall Notice states that

---

[1] https://www.coopersurgical.com/

CooperSurgical, Inc. became aware of complaints regarding this product, and noted that it posed a risk to the health of embryos, specifically impairing their development prior to the blastocyst stage and directed clinics to quarantine and return the culture.

35.    This matter was investigated and, according to regulatory authorities, CooperSurgical, Inc. issued the recalls due to a magnesium deficiency.

36.    The FDA posted a notice on its website regarding the recall in February of 2024, estimating that 994 bottles of culture media were affected, 481 of which were purchased by clinics across the United States.

37.    The Andries received a letter on February 9, 2024 from UIHC, informing them that their embryos failed to develop because of the defective culture media sold by CooperSurgical, Inc.

38.    The Cooper Defendants designed, formulated, manufactured, inspected, marketed, and sold the Global Media culture all over the United States, including the state of Iowa, and in selected countries around the world.[2]

39.    UIHC has a Division of Reproductive Endocrinology and Infertility, which has an IVF program that has one of the highest rates of embryo transfer in the United States.[3] This Division contains clinics that perform IVF in multiple cities in Iowa, including Davenport, Iowa City, and Des Moines. Through this Division, UIHC purchases large amounts of the Global Culture media and other medical products from the Cooper Defendants.

40.    The Cooper Defendants specifically market their product to fertility clinics in Iowa and sell their products in the State. They avail themselves of the market for their products

---

[2] https://fertility.coopersurgical.com/art_media/global/
[3] https://medicine.uiowa.edu/obgyn/divisions/division-reproductive-endocrinology-and-infertility

to residents of Iowa, receiving profits and proceeds from sales to medical providers and ultimately patients within the state.

41.    CooperSurgical, Inc. is also a foreign corporation registered to do business in Iowa and maintains contacts this way. CooperSurgical, Inc. is also an agent, as The Cooper Companies, Inc. does business through them and, therefore, CooperSurgical, Inc.'s contacts are imputed to The Cooper Companies, Inc.

## II.    COUNT I – NEGLIGENCE OF THE COOPER DEFENDANTS

1-41.    Plaintiffs hereby re-allege paragraphs 1 through 41, inclusive, and incorporate the same herein as if set forth fully.

42.    At all times material hereto, the Cooper Defendants had actual knowledge of the following facts:

a.    The Cooper Defendants were experts in the field of human fertility, especially IVF and understood that the culture media it developed as Global Media had to have the correct amounts of ingredients in the proper ratio to work and any significant deviation from that formulation would mean the IVF process was doomed to failure for that patient.

b.    The Cooper defendants were experts in the field of IVF and knew exactly how the culture media had to work if the patients IVF procedure were to have a chance of success.

c.    The Cooper Defendants knew if they delivered defective culture media the patients would undergo an expensive, emotionally and physically painful process for no reason, and with no chance of success.

> d.    The Cooper defendants knew culture media had one specific use, as a culture media used in IVF treatments which, even if successful, entailed substantial economic expense, physical pain, and emotional suffering for those attempting to have children via IVF.

> e.    Any failure of the IVF process due to a defective batch of culture media would cause economic losses, personal injury and emotional suffering to patients including the plaintiffs in this instance.

> f.    Healthcare providers such as UIHC who used the defendants culture media relied on the Cooper Defendants to ensure the purity and correct formulation of the media and would not perform their own independent test or quality control before using the culture media with patients such as plaintiffs.

43.    Despite their actual knowledge described in paragraph 42 above, in 2023, Cooper Defendants formulated a large batch of defective and toxic culture media, (Global Media), and, with actual knowledge of their inadequate and ineffective testing and quality control, sold the defective and toxic medium to UIHC for use treating Iowa IVF patients.

44.    As the provider of a culture media sold for a particular medical purpose, to be used in human IVF treatment by healthcare providers, the Cooper Defendants owed the plaintiffs a duty of reasonable care in the formulation, quality control, testing, handling and shipping of their culture media to avoid distributing a defective and hence toxic product as defendant's knew or should have known that plaintiffs would suffer foreseeable injuries, damages, harms and losses if the defective and toxic culture was used in their IVF treatment.

45.    The negligence of the Cooper Defendants includes but is not limited to the following acts of negligence:

a.      Defendants formulated and manufactured the Global Media culture product sent to UIHC which injured and damaged the plaintiffs with an insufficient level of magnesium, such that embryos placed in the culture would not develop during the blastocyte stage to reach full maturity and, thereby, viability, so the embryos could be transferred or frozen for later transfer.

b.      Defendants failed to inspect and perform safe and adequate testing, sampling and quality control to ensure the purity and efficacy of the defective culture media before it was sold and shipped to UIHC.

c.      Once they were put on notice that they may have sold defective Global Media to healthcare providers, including UIHC, in failing to promptly and immediately notify any and all providers that they should stop using defendant's product with their IVF patients until further investigation could ascertain the nature and extent of the problem.

## COUNT II.  BREACH OF IMPLIED WARRANTY FOR A PARTICULAR PURPOSE.

1-45.    Plaintiffs hereby re-allege paragraphs 1 through 45 inclusive, and incorporate the same herein as if set forth fully.

46.      Before the defective culture was sold to UIHC, and then plaintiffs, the Cooper Defendants had reason to know the particular purpose of the culture.

47.      Before the defective culture was sold to UIHC the Cooper Defendants had reason to know that the plaintiffs were relying on the defendant's skill or judgment to select and provide a safe and efficacious culture for their IVF process.

48.      The plaintiffs relied on the Cooper Defendants skill and judgment.

49.      The culture (Global Media) was not fit for the particular purpose of IVF.

50. The failure of the Global Media was a cause of damage to the plaintiffs as further discussed herein.

## DAMAGES AND REQUEST FOR JURY TRIAL

51. As a direct, proximate, factual and legal result of the negligence of the Cooper Defendants and their breach of implied warranty for a particular purpose, plaintiffs have been damaged in the following particulars.

    a. Erin Andries has undergone physical pain, suffering, and partial loss of function of the body.

    b. Erin and James Andries have endured emotional suffering, sadness, disappointment, and worry.

    c. James Andries has suffered the partial loss of consortium of a normal heathy spouse.

    d. James and Erin Andries have lost money and value for medical expenses, travel, lost wages, and income from employment.

52. Plaintiffs request a jury trial for all issues submissible to a jury against the Cooper Defendants for compensatory damages.

WHEREFORE, Plaintiffs ask the Court for individual and separate compensatory damages against the Cooper Defendants in amounts which will fully, fairly and reasonably compensate them for the harms and losses they have sustained and will sustain in the future, together with costs and interest as provided by law, and for such other relief as the Court may deem appropriate in the circumstances.

### III.    COUNT III – GROSS NEGLIGENCE/EXEMPLARY DAMAGES

1-52.    Plaintiffs hereby re-allege paragraphs 1 through 52 inclusive, and incorporate the same herein as if set forth fully.

53.    The Cooper Defendants knew that selling any defective culture media which was unable to perform its intended function would cause serious and possibly irreparable harm to patients and that the healthcare providers and the patients were relying on the Cooper Defendants to:

    a.    Produce their Global Media culture as formulated and advertised as an integral part of the IVF process.

    b.    Test, sample and otherwise use comprehensive quality control to ensure that every batch of culture sold was safe and efficacious as advertised before it was shipped.

    c.    Notify healthcare providers and patients of any indications of defects or problems involving its culture product immediately upon receipt of such information.

54.    The Cooper Defendants allowed a specialized solution for the culturing of embryos to leave their facility without properly testing it to ensure it had the appropriate levels of magnesium necessary to cultivate the embryos.

55.    The Cooper Defendants knew, or should have known, that by refusing or failing to inspect the Global Culture media for its fitness for its intended purpose, it was exposing patients such as plaintiffs to serious damage and injury.

56.    Upon information and belief, the Cooper Defendants knew, or should have known, that, prior to the Andries' beginning the relevant part of their IVF cycle, the Global

Media culture was or could be defective, and yet failed or refused to warn UIHC and the Andries' that they (The Cooper Defendants) did not have a comprehensive quality control plan covering their medium which could allow defective medium to be shipped to healthcare providers.

57.    As the Cooper Defendants knew, or should have known, that, prior to the Andries family beginning the relevant part of their IVF cycle, that the Global Media culture was defective, the Cooper Defendants had a duty to warn and should have warned the Andries family that the IVF cycle they were undergoing (and all the pain and risk associated with it) would not be successful due to the defective culture so that the process could be terminated before additional loss or damage.

58.    Once the Cooper defendants received notice of the potential defects in the media, they delayed notifying healthcare providers and their patients, causing further damage to plaintiffs. Defendants conduct amounted to willful indifference to the damages caused plaintiffs and others similarly situated and amounted to wanton and willful disregard for the rights and safety of plaintiffs, in violation of Chapter 668A of the Iowa Code, thus plaintiffs are entitled to punitive or exemplary damages in addition to compensatory damages.

59.    Plaintiffs ask for a bifurcated jury hearing/trial after the trial on compensatory damages to determine punitive damages.

WHEREFORE, Plaintiffs ask the Court for a judgment of punitive/exemplary damages under Chapter 668A of the Iowa Code against the Cooper Defendants in an amount that will deter such conduct in the future, and for such other relief as the Court may deem appropriate under the circumstances.

## IV.   JURY DEMAND

60.    Plaintiffs also ask for a jury trial on the issue of punitive or exemplary damages.


Respectfully submitted,

Steven J. Crowley      AT0001845
Edward J. Prill        AT0012435
Andrew L. Mahoney  AT0012329
CROWLEY, PRILL & MAHONEY
3012 Division Street
Burlington, IA 52601
T: (319) 753-1330
F: (319) 752-3934
E: scrowley@crowleyprillattorneys.com
E: eprill@crowleyprillattorneys.com
E: amahoney@crowleyprillattorneys.com
ATTORNEYS FOR PLAINTIFFS

University of Iowa Health Care

Name: Erin E Andries | DOB: 6/9/1988 | MRN: 06541082 | PCP: No-Primary Care Provider | Legal Name: Erin E Andries

# Letter Details



**UNIVERSITY OF IOWA
HOSPITALS&CLINICS**

University of Iowa Health Care

*Andrology and In-Vitro Fertilization Laboratories*

*UI Health Care–North Dodge*
*1360 North Dodge St, Suite 2000*
*Iowa City, IA 52245*
*319-384-8354 Tel*
*319-384-8353 Fax*
*uihc.org/infertility-care*

February 9, 2024

ERIN E. ANDRIES

Re: Erin E Andries
Hosp #: 06541082
DOB: 6/9/1988

Dear Erin,

We were disappointed in the outcome of your prior cycle because of the culture media we received from CooperSurgical. We recognize that this was not only disappointing for you but also delayed your family building. We are writing with an update we have received from CooperSurgical. CooperSurgical has provided a letter to our clinic with the following information:

Taken directly from the letter we received from CooperSurgical:

> *As we discussed, we are willing to reimburse your patients for either (1) the out-of-pocket fees they incurred for this impacted cycle; or (2) the out-of-pocket fees incurred for the next cycle, should they choose to do a fresh cycle.*

> *In order for our Accounting Department to process the correct reimbursable amount, we will ask your patients to send the invoices detailing the dates of service, nature of services, charges for such service, any insurance adjustments and payments made, and with corresponding receipts of payment to FertilityPatient@coopersurgical.com. We will also need a completed and signed W-9 Form to issue them a check.*

> *In addition to collecting the documentation set forth above, we will provide each patient with a Confidential Release and Settlement Agreement.*

> *Upon receiving the required documentation and the signed Confidential Release and Settlement Agreement from each patient, we will issue a check for each patient's out-of-pocket expenses.*
> *If you or your patients have questions or need additional assistance, the following*

resources are available:

- *Medical Questions: FertilityPatient@coopersurgical.com*
- *Legal Questions: Legal@coopersurgical.com*
- *Product Surveillance: ProductSurveillance@coopersurgical.com*

You have options and our financial team is happy to provide cost information for you if needed.

1. Complete the steps CooperSurgical is requiring to proceed with the settlement agreement.

   a. Complete the UIHC HIPAA release/authorization form attached to the MyChart message we will send today. We will enclose the form with a copy of this letter we will be sending by standard mail.

   b. Send your HIPAA release form to our clinic via MyChart, fax (319-384-8353) or email: OBGYN-RT-IVFLabs@healthcare.uiowa.edu. Our clinic will submit your contact information and HIPAA form to CooperSurgical.

   c. Once they receive notification from our clinic, CooperSurgical will require you to submit additional documents.

   d. If you have insurance, you will need to inform us if you want us to bill your insurance or to bill you directly so that you can submit charges to CooperSurgical. The information we have received from CooperSurgical **does not** address whether patients who have coverage are required to submit charges to their insurer.

2. Decline the settlement offer and proceed with whatever form of payment you were planning on previously.

If you decide to pursue the compensation offer from CooperSurgical, our administration will place a "stop bill" on any IVF related medical charges incurred during a repeat cycle. Patients who have a stop bill placed on their charges will need to determine whether claims are submitted to your insurance provider within 60 days of the date of service for each charge or billed directly to you. You may discuss these options with the IVF finance team: office line 319-356-4840 & email fertility-finance@uiowa.edu.

UIHC will honor the offer to waive charges for the cost of the andrology and embryology laboratory fees for your next cycle as previously discussed. Again, we are sorry for this situation and the difficulties and disappointment this situation has caused.

Sincerely,

Rachel Mejia, D.O.
Clinical Associate Professor
Director, In Vitro Fertilization Program
Department of Obstetrics & Gynecology


Amy E.T. Sparks, Ph.D.
Clinical Assistant Professor
Director, In Vitro Fertilization Program
Department of Obstetrics & Gynecology

Document electronically signed 2/9/24

*This information has been disclosed to you from records whose confidentiality is protected by state law.   State law prohibits you from making further disclosure of the information without specific written consent of the patient to whom it pertains, or as otherwise permitted by law.*

*This letter was initially viewed by Erin E Andries at 2/10/2024 6:02 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2024

April 1, 2024

*The Andries Family*

Our story began in July 2016. When we met, James was in the beginning stages of divorce from his previous wife. At that time, he had three children, aged nine, four, and one.

He elected to get a vasectomy in 2015 after the birth of his youngest child. He didn't plan on falling in love, getting married, or having more kids. Nevertheless, we fell in love and got married on October 26, 2019.

I was thirty when we married and didn't yet have children of my own. I always believed I would become a mom at some point, but understood we would not have any without medical intervention. We researched and carefully considered all our options.

Insurance would not pay for a vasectomy reversal and would cost almost $10,000 out of pocket. Not only was the procedure costly, the chances for natural conception were about 40% or less, particularly because James' vasectomy had been in effect for nearly eight years.

These odds felt like a bit of a gamble to us. What if natural conception took longer than expected? What if, after paying for a reversal, we still needed to resort to in vitro fertilization?

We also considered the cost of another vasectomy after our child was born. Several medical professionals recommended IVF. Ultimately, we agreed that IVF would be the most efficient and (hopefully) faster option.

After we made our decision, we waited five months for a consultation appointment. In September 2023, the IVF process finally began. We knew there would be a lot of appointments, missed work time, travel time, and expenses. But every completed appointment got us closer to the next step.

Stim shots began on October 27, 2023, the day after our fourth wedding anniversary. The idea of so many injections was quite frightening to me, but James was proactive and incredibly supportive throughout the process. He drew up each syringe and administered every single injection. Without him, I would have felt overwhelmed.

I was underprepared for the emotional and physical toll that the stim shots would put on my body. Some days, the injections themselves were fairly painless. Other days, the injections stung and burned. The symptoms that followed included abdominal discomfort, bruising, bloating, severe fatigue, and constipation. I dreaded each injection because I would *just* start to feel better, then James would announce it was time for the next dose.

For days, I barely slept for more than a few hours a night due to a deep, unrelenting ache. My ovaries felt like they were the size of tennis balls, and I felt as if I was riding a perpetual roller coaster.

One of our most profound memories of IVF occurred on November 1, after six days of stim shots. I had slept very little that night and experienced the most pain and exhaustion yet. During an ultrasound appointment, I exclaimed, "I'm being pumped full of hormones!"

slightly different demeanor. She was unusually quiet as she diligently did her job. It felt like she knew something that we didn't.

"I can't find anything," she finally said. She didn't seem surprised, like she knew that she wouldn't find a baby to begin with.

To say we were shocked was an understatement. I was completely speechless and felt numb and empty. I didn't say much for the remainder of the appointment. I just wanted to disappear and wallow in my sorrow and self-pity.

The doctor explained everything to us thoroughly and scientifically based on what the clinic believed had happened. "There was a problem with the culture media. We wanted to tell you in person," he gently concluded. To be honest, I couldn't process what he said. The details didn't matter much to me at the time.

We planned to announce to our kids and our families that we were expecting on Christmas day. Christmas morning came, but I no longer felt like celebrating. I tried to put on a happy face and be present in the moment, watching the kids open their gifts. I couldn't think about anything else other than how I wished, more than anything, that the day would have been different. For the day to play out the way that I had imagined it: to reveal to our kids, who are now seventeen, twelve, and eight, that they were finally going to have a little brother or sister.

I imagined telling my parents that they were going to have their first biological grandchild. Couples I knew began announcing their pregnancies on social media. I was bitter and jealous, thinking, *"THAT SHOULD HAVE BEEN ME!"*

I finally understood what it felt like to be in the shoes of so many others who had suffered loss. I struggle far more than I thought I would "if it were ever to happen to me."

This experience has made a profound, humbling impact on me. I often don't realize the stress and weight I've been carrying since that ultrasound scan. I began taking a new daily anxiety medicine. I began practicing yoga, just to calm the storm of emotions that fester inside of me.

Some days, I can calmly explain our story to others. But other times, I succumb to the weight of my emotions because I don't allow them to come out. It's easier to keep my emotions bottled up than to allow my tears to flow freely. On days like today, putting our story into words on paper is truly painful.

While I'm trying to better prepare myself emotionally and physically to get ready for a second IVF cycle, it's difficult to get in that head space. I know what to physically expect, but we will carry more fear and anxiety with us to each appointment.

To a worldwide medical corporation, we are just a case number. However, we hope that you will not coldly disregard the stories that families bravely share. Instead, we urge you to evaluate each case with compassion, respect, and to provide justifiable compensation. Thank you for your time and careful consideration.

Sincerely,

Erin and James Andries









